**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**DANIEL KELLEY, #L2563**                                                         **PLAINTIFF**

**VS.**                                                       **CIVIL ACTION NO. 3:14CV82-LRA**

**J. BUSCHER, ET AL**                                                              **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

The parties appeared and participated in an omnibus hearing before the undersigned United States Magistrate Judge on January 27, 2015, at the Jackson Federal Courthouse in Jackson, Mississippi. Daniel Kelley ("Plaintiff" or "Kelley") appeared *pro se*; Defendants were represented by attorney Steven J. Griffin, Jackson, Mississippi. The case is now before the Court on Defendants' Motion for Summary Judgment [81]. After consideration of the motion, the supporting pleadings, Kelley's sworn testimony, the record, and the applicable law, the Court finds that the motion of Defendants is well-taken and shall be granted.

**I. Facts**

Jurisdiction of this case is based upon 42 U.S.C. § 1983. Plaintiff is a convicted felon who was housed in the East Mississippi Correctional Facility [EMCF] in the custody of these Defendants when the events he complains about occurred. According to his testimony, he had been housed in lockdown at EMCF since December 13, 2013, at the time of the January 27, 2015, omnibus hearing.

Plaintiff's primary complaint was that he received a rule violation report (RVR) for escaping his housing unit to retrieve contraband, was found guilty, and was assigned to administrative segregation as punishment. The Report of Investigation prepared by Defendant James Alexander, Investigator, dated December 23, 2013, described the events that occurred at EMCF on December 17, 2013. [81-4]. Inmates were observed on the security cameras outside the prison perimeters. The cameras showed five inmates climb out of the roof from the ventilation duct. A hole was cut in the tin roof in unit 1-A-Pod; a homemade rope was tied to a vent stack, and inmates climbed down. The cameras also showed individuals throwing footballs over the perimeter fence on December 16, 2013. These footballs contained three pounds of tobacco, four black flip-phones and batteries, two chargers, three loose SIM cards, and six black saw-blades. Packages of contraband were retrieved and brought back into the prison by the inmates. The report [81-4, p. 5] concluded:

> As a result of this investigation and evaluation of the available evidence, it has been determined that inmates David Grogan, Terrance Stewart, Claude Johnson, Eric Horton, Daniel Kelly, exited housing unit 1-A pod [through] the ventilation duct work where they proceeded to cut a hole in the roof. They then exited the confinement of the building made their way across the EMCF roof where Inmate Grogan and Stewart climbed down and entered the housing unit 3 and 4 outside recreation yard where Grogan proceeded to gather packages of contraband that had been thrown over the perimeter fence by 2 unknown subjects. After gathering the packages all Suspects were then able to make their way back to the hole where they reentered housing unit 1-A-pod [through] the vent.

Plaintiff was issued an RVR, found guilty, and put in lockdown as punishment. He also complains that the conditions under which he was housed while in lockdown were constitutionally inadequate.

Plaintiff testified at the omnibus hearing that the RVR hearing officer (Lt. Jones) violated his rights. He charges that she refused to interview witnesses; she did not look at the camera footage; she refused to conduct an investigation; and, she would not tell him the evidence she relied on to find him guilty. According to Plaintiff, she was not an impartial hearing officer and did not do her job of reviewing the evidence. His punishment was long-term administrative segregation or "lockdown" and reclassification.

Kelley also testified that while he was in lockdown he had no heat or showers or lights for nearly four months. He could not do his legal work in the dark, and now he has problems with his eyesight. According to Plaintiff, Defendants Buscher and Alexander are the officials who instructed the other officers to write him up for escape. They also failed to thoroughly investigate the situation, denied his appeals, and failed to improve the conditions. Plaintiff testified that his eyesight was harmed, but he had no other physical injuries as a result of the conditions. Yet he described the conditions as a "threat to his health." He testified regarding his specific complaints, and the Court refers to his sworn testimony from this hearing. [79, 82-1].

## II. Standard of Review

"Summary judgment is appropriate if the moving party can show that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *United States v. Renda Marine, Inc.,* 667 F.3d 651, 655 (5th Cir.2012) (quoting Fed.R.Civ.P. 56(a)). "A factual dispute is 'genuine' where a reasonable party would return a verdict for the nonmoving party." *Chiu v. Plano Indep. Sch. Dist.,* 339 F.3d 273, 282 (5th Cir.2003) (quoting *Lukan v. North Forest Indep. Sch. Dist.,* 183 F.3d 342, 345 (5th Cir.1999). When considering a summary judgment motion, a court "must review all facts and evidence in the light most favorable to the non-moving party." *Juino v. Livingston Parish Fire Dist. No. 5,* 717 F.3d 431, 433 (5th Cir.2013). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir.2003) (citing *Bridgmon v. Array Sys. Corp.,* 325 F.3d 572, 577 (5th Cir.2003); *Hugh Symons Group, plc v. Motorola, Inc.,* 292 F.3d 466, 468 (5th Cir.2002)).

### III.  Discussion

**A.    Plaintiff's claim that his RVR conviction for escape violated the United States Constitution**

To invoke the protections of the Due Process Clause, Plaintiff must have a protected liberty interest at stake. A constitutionally protected liberty interest is "limited to freedom from restraint which ... imposes atypical and significant hardships on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). Long-term segregation is not an "atypical and significant" hardship of prison life. *Pichardo*

*v. Kinker,* 73 F.3d 612, 613 (5th Cir. 1996) (finding that administrative segregation, without more, does not constitute a deprivation of a constitutionally cognizable liberty interest). Kelley's custody status was reclassified after the RVR conviction and he was ultimately assigned to long-term segregation. As the Court in *Pichardo* stated, "absent extraordinary circumstances, administrative segregation as such, being incident to the ordinary life as a prisoner, will never be a ground for a constitutional claim." *Id.*

Such extraordinary circumstances were found by the Supreme Court in *Wilkinson v. Austin*, 545 U.S. 209 (2005). It held that the use of solitary confinement in Ohio's Supermax facility did impose "atypical and significant hardship." The Fifth Circuit also found that solitary confinement for 39 years under restrictive conditions in Angola was atypical and imposed significant hardships. *Wilkerson v. Goodwin,* 774 F.3d 845, 854 (5th Cir. 2014). The undersigned has analyzed Kelley's segregated confinement in accordance with the factors used in both *Wilkinson* and *Wilkerson*.

The Court directed additional briefing in light of the holding in *Bailey v. Fisher*, Civ. No. 3:11cv300-FKB, 2016 WL 2619408 (5th Cir. May 6, 2016), and Defendants have now supplemented the motion [103, 105] to further describe Plaintiff's confinement since the initial punishment regarding the December 17, 2013, escape conviction. According to the Affidavit of Sharon Williams, case manager at EMCF, dated August 19, 2016, as supported by the Drill Down Detail Report on Kelley, Kelley was initially housed in Intake until being sent on December 31, 2013, to Unit 6-D, the administrative segregation unit. He remained there until February 2014 and was then sent to Unit 5-A, a long term segregation unit with

a "step-down program" that allows offenders to progress toward a return to open population. Ms. Williams described the conditions in each Unit. On April 22, 2014, Kelley was "promoted" to Unit 5-C, enjoying significantly greater privileges than in Unit 5-A or 5-B but still part of the long-term segregation unit. He remained there until transferred on a court order to the Madison County Detention Center for nine months, from February 17, 2015, through November 20, 2015. When returned to EMCF, he was again housed in Unit 5-C. On January 7, 2016, he was "promoted" to Unit 5-D, for offenders preparing to move back into open population.

Kelley was moved to Unit 1-C, open population, on January 13, 2016. On January 31, 2016, he was moved to Unit 6-C, an open population zone for close custody offenders. He was moved to Unit 6-D (administrative segregation) on February 8, 2016, pending an investigation for protective custody. This was unrelated to his RVR for escape. He was moved March 15, 2016, to Unit 6-B, an open population zone for close custody offenders. Then on March 23, 2016, he was moved back to Unit 6-D (administrative segregation) pending an investigation for fraudulent conduct, unrelated to the RVR at issue in this case. On May 17, 2016, he was moved to Unit 1-B, an open population unit for close custody offenders. On May 25, 2016, he was moved to Unit 2-C, which is a pre-release open population zone for medium custody offenders. He remains housed there.

The Drill Down Report confirms the sworn statement of Ms. Williams regarding the housing placement of Kelley. Plaintiff concludes that the total time he spent in administrative segregation/ long-term status for this RVR (01448290) was 25 months

(December 17, 2013, through January 13, 2016), with an additional 19 months on close custody. [104, p. 2]. He asserts that his custody classification is still adversely affected by "additional 7 points" through December 17, 2023, due to RVR (01448290). These conclusions do not appear to conflict with the review by Ms. Williams in some respects, although the various units he was housed in during his administrative segregation had very different restrictions. The restrictions in the "step down" portions and close custody housing were similar to open population. And, whether or not an RVR is used for classification purposes by MDOC does not determine whether or not *Sandin* is utilized in the due process analysis.

As Defendants point out, the Court in *Bailey* recognized that "both the severity of the restrictive conditions and their duration are key factors in determining whether an inmate has a liberty interest in his custodial classification." *Id*. at *3, citing *Wilkerson*, 774 F.3d at 854. A sliding scale is employed, considering how bad the conditions are and how long they last. *Id.* "Two and a half years of segregation is a threshold of sorts for atypicality." *Id.*, citing *Wilkerson*, 774 F.3d at 855. The *Bailey* Court quoted *Wilkerson* in finding that 18-19 months of segregation under "even the most isolated of conditions may not implicate a liberty interest." *Id*. Even if Kelley is correct in his claim of 25 months of segregation, this still does not reach the "threshold" of 2 ½ years referred to by the Fifth Circuit.

In contrast, Defendants contend that Plaintiff was only housed in *isolated* conditions at EMCF lockdown for less than four months following his RVR conviction for escaping his housing unit [three months and 22 days, from December 31, 2013, through April 22, 2014].

7

The Williams Affidavit and the Drill down Report support this conclusion, and Plaintiff has not rebutted this evidence with the required proof. Once Plaintiff was "promoted" to Unit 5-C on April 22, 2014, he could come out of his cell from 6 a.m. until 5 p.m. While out, he could watch television, shower, use the phone, visit in the day room, and go outside to the recreation yard. He could order from the commissary and have visits monthly. This may have been part of the long-term segregation program at EMCF, but the housing conditions were not atypical for normal prison life. Kelley was only returned to the most restrictive housing on two short occasions, unrelated to the RVR. He currently is housed in the open population on Unit 2-C.

Plaintiff contends that the conditions in those housing units were poor and that his rights were violated by these conditions. The Court has reviewed Ms. Williams's description of the provisions in each of the units Plaintiff lived in and compared same to Plaintiff's descriptions and the considerations used by the Courts in *Wilkerson* and in *Wilkinson*. As Defendants point out, the most restrictive Unit was 6-D, but Plaintiff was only there from December 31, 2013, through February 10, 2014. No television was provided, the inmate had no visitation whatsoever, and he was locked down at least 23 hours a day. Some outdoor recreation was allowed for one hour per day, although Plaintiff contends this was often not allowed (and not allowed him until April 22, 2014, when he was moved to 5-C). Showers were to be allowed three times a week, but Plaintiff contends he was only allowed one shower a week. On February 10, 2014, Plaintiff was moved to 5-A, where conditions were less restrictive. Some visitation was allowed, phones were available, and there was a

television in the day room which inmates could watch through their door windows. This unit was considered an "orientation zone," where inmates are housed prior to being released from long-term segregation.

Once Kelley was moved to 5-C on April 22, 2014, he was allowed many more privileges, including being out of his cell and in the day room from 6 a.m. until 5 p.m. His "lockdown" thereafter was never so restrictive as in his initial restricted confinement of three months and 22 days. Having carefully reviewed his housing for his incarceration from December 13, 2013, to the present, as described by both Plaintiff and Defendants (through supporting records), the undersigned finds that his long-term administrative segregation was clearly not atypical--- due process rights did not attach. *Sandin* applies, and the Court finds that no constitutional claim has been stated.

However, assuming that Kelley did have such a right, Due Process's fundamental requirement is that the prisoner be granted the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). In reviewing the record and the pleadings, Plaintiff has stated supportive facts that merely show that he disagrees with the RVR charges and the ruling at his hearing and on appeal. He contends that these Defendants failed to investigate his RVR properly and failed to allow his witnesses and access to the camera footage. But, the failure to investigate is not a constitutional violation. *Dehghani v. Vogelsang*, 226 F.App'x 404, 406 (5th Cir. 2007) (holding that plaintiff's allegation that warden failed to adequately investigate his grievance did not amount to a constitutional

9

violation). Additionally, the records show that a thorough investigation was performed at the prison. Many interviews were conducted and camera footage was utilized.

The United States Supreme Court has held that "the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits. This standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced ....'" *Superintendent, Mass. Correctional Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985) (quoting *United States ex rel. Vajtauer v. Commissioner of Immigration*, 273 U.S. 103, 106 (1927). The evidence in this case is supportive of the findings of guilt, as Plaintiff admitted to the investigators that he participated in the incident, and other inmates named him as being a participant. Because of this evidence, fundamental fairness does not require this Court to set aside decisions of prison administrators that "have some basis in fact." *Hill,* 472 U.S. at 456. The courts cannot retry every prison disciplinary dispute; rather, the court may act only where arbitrary or capricious action is shown. *Reeves v. Pettcox,* 19 F.3d 1060, 1062 (5th Cir. 1994). Prison disciplinary decisions will be overturned only where there is no evidence whatsoever to support the prison official's decision. *Id.* The federal courts cannot act as a reviewing board for prison disciplinary actions.

The record in Kelley's case confirms that there was evidence to support his conviction, and minimum due process requirements were satisfied. He knew about the charges and the hearing, was allowed an opportunity to testify, and was given the opportunity to appeal. Under the circumstances of this case, this satisfies due process, although Plaintiff

10

was not satisfied with the outcome. No constitutional violation has been stated against these Defendants.

**B.      Conditions of Confinement**

Plaintiff also complained about the conditions of his administrative segregation, charging that he had little light in his cell, and his eyes were injured.

The Court finds that Plaintiff's allegations, taken in a light most favorable to him, simply do not rise to the level of a constitutional violation. Harsh "conditions of confinement" may constitute cruel and unusual punishment unless such conditions are "part of the penalty that criminal offenders pay for their offenses against society." *Whitley v. Albers*, 475 U.S. 312, 319 (1985) *quoting Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Gillespie v. Crawford,* 833 F.2d 47, 50 (5th Cir. 1987). In order to successfully prove an Eighth Amendment conditions of confinement claim, a civil rights plaintiff must allege facts which suggest that the prison officials' conduct resulted in the plaintiff being incarcerated under "conditions which [posed] an unreasonable risk of damage to [the prisoner's] future health." *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir.2001). This "risk must be of such a level that today's society would not tolerate it." *Id*. In order to prevail on such a conditions of confinement claim, a plaintiff must plead facts which establish: (1) objectively, that the deprivations are sufficiently serious; and (2) subjectively, that the defendant prison officials knew of the deprivations but nevertheless have shown a "deliberate indifference" to the plaintiff's "health or safety." *Id.*; *see also Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir.1998).

A prisoner must show that the inflicting officer has exhibited "deliberate indifference" to the conditions. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).  Mere negligence does not satisfy the "deliberate indifference" standard. *Id.*  The prisoner must suffer from an **extreme deprivation** of any "minimal civilized measure of life's necessities." *Id.* at 304.  Like other Eighth Amendment claims, a conditions-of-confinement claim must satisfy tests for both the objective and subjective components.  *Davis v. Scott*, 157 F.3 1003, 1006 (5th Cir. 1998), *citing Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  As the Court noted in *Davis*, since "[f]or the objective component, extreme deprivations are required to make out a conditions-of-confinements claim," and cannot be made, it is unnecessary to reach the subjective component.

 In Plaintiff's case, neither the objective or subjective components can be met.  It is obvious that these prison officials were not attempting to punish Plaintiff by the lighting.  No constitutional claim has been stated against any Defendant regarding Plaintiff's conditions of confinement while housed in segregation.

### IV.  Conclusion

**IT IS THEREFORE ORDERED AND ADJUDGED** that:

Defendants' Motion for Summary Judgment [81] is hereby **GRANTED**, and the Complaint is dismissed with prejudice.  A separate Final Judgment in favor of all Defendants shall be entered on this date.

SO ORDERED this the 28th day of September 2016.

/s/ Linda R. Anderson
UNITED STATES MAGISTRATE JUDGE